The State ex rel. Granville v. Gregory.

THE STATE *ex rel.* GRANVILLE V. GREGORY *et al. constituting State Board of Health.*

1. **Corporation**: POWER TO ISSUE DIPLOMA. The "Kansas City Hospital College of Medicine" incorporated under Rev. Stat., 1879, sec. 974 *et seq.* has authority to confer diplomas on its graduates.

2. **Practice of Medicine and Surgery**: STATUTE. Under the Act of the General Assembly approved April 2, 1883 (Laws, p. 115) regulating the practice of medicine and surgery in this state, an applicant for a certificate to practice medicine and surgery who possesses a diploma must furnish to the State Board of Health satisfactory proof of having received such diploma from a legally chartered medical institution in good standing.

3. **State Board of Health**: MANDAMUS. The granting of such certificate to holders of diplomas involves matters of judgment and discretion on the part of the State Board of Health and will not be enforced by mandamus.

*Mandamus.*

WRIT DENIED.

*Bryant, Holmes & Waddill* for relator.

(1) The first ground of demurrer which questions the power of all educational institutions created under R. S., Art. X, p. 178, to issue diplomas, or to confer degrees upon their graduates, is not well taken. The act of March 3, 1874 (Laws, page 23) is still in force. R. S. sec. 3160 must yield to R. S. sec. 3161 (*Powers v. Barney,* 5 Blatch. 203), or they must nullify each other. *State ex rel v. Heidorn,* 74 Mo. 410. Educational institutions created under the general laws of this state have always had the power implied and necessarily incidental to the purposes of their formation, to confer degrees and issue diplomas both before and after the passage of the act of March 3, 1874, and regardless of said act. Morawetz on Corporations, secs. 152, 154, 189. (2) The second ground of the demurrer is likewise not well taken. The construction contended for by respondent would practically

nullify section 1 and require all applications to be made under section 2 of the act in question, which manifestly was not the intention of the legislature, and is in the very teeth of the language it has employed to express its meaning: "If there be two affirmative statutes, or two affirmative sections of the same statute, on the same subject, the one does not repeal the other if both may consist together, and the court ought to seek for such a construction as will reconcile them together." *Bruce v. Schuyler*, 4 Gil. (Ill.) 221 ; *Fowler v. Pirkins*, 77 Ill. 271 ; *Warder v. Arell*, 2 Wash. (Va.) 282. (3). The third ground of the demurrer has obviously no bearing on this case and is fully covered by what has been said *supra*. (4) The relator made his application in this case under section 1. The pleadings show that he presented his diploma to the State Board of Health for verification as to its genuineness ; that it was duly verified by the affidavit of the relator, the holder and applicant, that he was the lawful possessor of the same, and that he was the person therein named ; that said diploma was by the Board of Health found to be genuine and that the person named therein (who was the relator) was the person claiming and presenting the same, and the secretary of the board received from him the fee of one dollar, which he still retains. These facts clearly entitled him to the certificate mentioned in section 1, and the court should, therefore, award to the relator a peremptory writ of mandamus.

*D. H. McIntyre*, Attorney General, for respondent.

(1) The first ground of the demurrer is well taken. R. S., secs. 706 and 707 ; *Bk. of Augusta v. Earle*, 13 Pet. 519 ; Boone on Corporations, § 35; Morawetz on Corporations, § 149 ; *Thomas v. R. R.*, 101 U. S. 71, 82 ; *Dartmouth College v. Woodward*, 4 Wheat. 636 ; *McIntyre v. Ingraham*, 35 Miss. 25 ; *Gains v. Coats*, 51 Miss. 335 ; *Ruggles v. Collier*, 43 Mo. 353. (2) The object of the legislature in the enactment of laws regulating the

practice of medicine and surgery was the elevation of the standard of the proficiency of the profession, and at the same time as a necessary part of the same object to get rid of quacks and empirics, and the petition fails to aver even that the institution from which relator obtained his diploma was one of good standing. This fact must exist, otherwise no certificate can be granted, and whether the institution in a given case is of good standing or not, is a question for the board who are entitled to determine that fact on account of their superior knowledge of such institutions and their authority to issue said certificates. (3) The Kansas City Hospital College of Medicine is conducting its college for a pecuniary consideration and is therefore illegally chartered and organized (R. S., sec. 978), and if not so is exceeding its charter powers, and in either case the writ asked for should be denied.

SHERWOOD, J.—This is an original proceeding in this court, having for its object our peremptory writ commanding respondents to issue and deliver to the relator a certificate, as provided for in the act of April 2, 1883, authorizing him to practice medicine in this state.

The issuance of the alternative writ has been waived, the petition therefor, by agreement, standing in lieu thereof.

The petition is as follows:

"The state of Missouri, at the relation of Edwin G. Granville, complains of the defendants, E. H. Gregory, G. M. Cox, J. C. Hearne, G. T. Bartlett, W. B. Connery, H. F. Hereford and Albert Merrell, and says that said defendants constitute the State Board of Health of Missouri: That on the 17th day of November, A. D., 1882, the Kansas City Hospital College of Medicine was duly created and became a body corporate and politic under and by virtue of the laws of the state of Missouri regulating the incorporation of benevolent, religious, scientific, educational and miscellaneous asso-

ciations; that said Kansas City Hospital College of Medicine, in accordance with the provisions and requirements of its charter of incorporation, duly commenced and has ever since been engaged in the teaching of medicine and surgery, and those sciences a knowledge of which is necessary or proper for a full and adequate understanding of medicine and surgery in all their scope and branches; that the relator, the said Edwin G. Granville, was, on the 15th day of March, A. D. 1883, duly graduated by said Kansas City Hospital College of Medicine, and duly received a diploma from said Kansas City Hospital College of Medicine bearing date said 15th day of March, A. D. 1883, and said relator, the said Edwin G. Granville, thereupon became, and ever since has been, and now is, a graduate of medicine; that heretofore, to-wit, on or about the 5th day of September, A. D. 1883, the said relator duly presented his said diploma to the said defendants, as such State Board of Health of Missouri for verification as to its genuineness; that said diploma was duly verified by the affidavit of said relator (who was the holder thereof), that he was the lawful possessor of the same, and that he was the person therein named, which said affidavit was duly taken before the defendant, E. H. Gregory, who was the president of said State Board of Health of Missouri, and as such authorized to administer oaths, and said affidavit was duly attested under the hand of said defendant, E. H. Gregory, as such president, and the official seal of said State Board of Health of Missouri; that said diploma was by said defendants, as such State Board of Health of Missouri, found to be genuine as represented, and that said relator was the person named therein and claiming and presenting the same, and it thereupon became and was the duty of said defendants, as such State Board of Health of Missouri, to issue and deliver to said relator a certificate to that effect, signed by at least four of the members of said State Board of Health of Missouri, upon the payment by said relator to the

secretary of said State Board of Health of Missouri of a fee of one dollar, which said fee of one dollar the said relator duly paid to, and the same was received by the defendant, J. C. Hearne, who was the secretary of said State Board of Health of Missouri, and by whom said fee is still retained; that the said relator duly demanded of the defendants as such State Board of Health of Missouri, the issuing and delivery to him of such certificate as aforesaid, which the said defendants, as such State Board of Health of Missouri, wrongfully refused and still wrongfully refuse to do, to the great and irreparable wrong, injury and damage of the said relator. And the plaintiff further states that the said relator will suffer great and irreparable wrong and injury, and is entirely without remedy for the redress thereof without the interposition of this court by its writ of mandamus directed to the said defendants, as such State Board of Health of Missouri, commanding and directing the performance and discharge of said duty. Wherefore, the plaintiff prays the court to issue and direct to said defendants a writ of mandamus, directing and commanding them as such State Board of Health of Missouri, to issue and deliver to the said relator the certificate of said State Board of Health of Missouri, signed by at least four of the said defendants as members thereof, to the effect that the said relator, Edwin G. Granville, did present his diploma from the Kansas City Hospital College of Medicine to the said State Board of Health of Missouri for verification as to its genuineness, that the said diploma was found to be genuine, and that the said relator was the person named therein, and was the person claiming and presenting the same."

The demurrer of the respondents to the petition is based on these grounds: First. It nowhere appears in said alternative writ that the said Kansas City Hospital College of Medicine has any legal authority, or any authority whatever, to issue diplomas and confer degrees upon its so-called graduates. Second. It is not stated

that said Kansas City Hospital College of Medicine is a medical institution in good standing, or that it was found to be such by the respondents, as required by the act to regulate the practice of medicine and surgery in the state of Missouri, approved April 2, 1883. Third. It does not appear that the relator presented himself to said board of health and offered to submit himself to such examination as said board should require, as required by the act last above mentioned.

The provisions of the act approved April 2, 1883, entitled "an act to regulate the practice of medicine and surgery in the state of Missouri," so far as necessary for quotation, are these:

"SECTION 1.   Every person practicing medicine and surgery, in any of their departments, shall possess the qualifications required by this act. If a graduate of medicine, he shall present his diploma to the state board of health for verification as to its genuineness. If the diploma is found to be genuine, and if the person named therein be the person claiming and presenting the same, the state board of health shall issue its certificate to that effect, signed by at least four of the members thereof, and such diploma and certificate shall be deemed conclusive as to the right of the lawful holder of the same to practice medicine in this state. If not a graduate, the person practising medicine in this state shall present himself before said board and submit himself to such examination as the said board shall require, and if the examination be satisfactory to the examiners, the said board shall issue its certificate in accordance with the facts, and the lawful holder of such certificate shall be entitled to all the rights and privileges herein mentioned.

"SEC. 2.   The state board of health shall issue certificates to all who shall furnish satisfactory proof of having received diplomas or licenses from legally chartered medical institutions in good standing of whatever school or system of medicine; they shall prepare two forms of certificates, one for persons in possession of diplomas or

licenses, the other for candidates examined by the board;
they shall furnish to the county clerks of the several
counties a list of all persons receiving certificates; pro-
vided that nothing in this act shall authorize the board
of health to make any discrimination against the holders
of genuine licenses or diplomas under any school or
system of medicine.

"SEC. 3.   Said state board of health shall examine
diplomas as to their genuineness, and if the diplomas
shall be found genuine as represented, the secretary of
the state board of health shall receive a fee of one dollar
from each graduate or licentiate, and no further charge
shall be made to such applicant; but if it be found to be
fraudulent, or not lawfully owned by the possessor, the
board shall be entitled to charge and collect twenty dol-
lars of the applicant presenting such diploma.   The
verification of the diploma shall consist in the affidavit
of the holder and applicant, that he is the lawful pos-
sessor of the same, and that he is the person therein
named; such affidavit may be taken before any person
authorized to administer oaths, and the same shall be
attested under the hand and official seal of such officer, if
he have a seal.   Graduates may present their diplomas
and affidavits as provided in this act, by letter or by
proxy, and the state board of health shall issue a certifi-
cate as though the owner cf the diploma was present.

"SEC. 4.   All examinations of persons not graduates
or licentiates 'shall be made directly by the board, and
the certificates given by the board shall authorize the
possessor to practice medicine and surgery in the state of
Missouri."

I.   The third ground of demurrer will not be dis-
cussed because of being irrelevant to the case made by
the petitioner and foreign to its allegations.

II.   In determining the first ground of the demurrer
it is unnecessary to rule whether the act of March 3,
1874, which authorizes the board of directors or trustees
of any college to confer degrees is still in force as a part

of the general law for these reasons : The date at which the petition alleges the incorporation of the college from which relator claims to have received a diploma is December 17, 1882. This allegation, together with others of the petition, shows that such college was incorporated under the provisions of the general law relating to corporations, and more especially under section 974, *et seq.*, which section provides for the incorporation of "any school, college, institute, academy or other association, formed for educational or scientific purposes," etc. By these general statutory provisions which have been accepted and acted upon, an incorporation was effected as set forth in the petition and admitted by the demurrer, resulting in the establishment of the Kansas City Hospital College of Medicine. Now when the legislature authorized, by a general law to that effect, the incorporation of colleges, it must be presumed to have been conversant with the effect of such a general enactment, and to have intended that the usual incidents and consequences should flow from such incorporations. Among the incidents and consequences which have been customary with institutions of this character are those of conferring degrees upon those of the students who, having pursued the curriculum have graduated, and the issuance to them of diplomas bearing evidence of that fact. This has been done by such institutions since the thirteenth century. 2 Kent Com. 270. A diploma is said to be "a document bearing record of a degree conferred by a literary society or educational institution." Webst. Dict. In short, a statement in writing, under the seal of the institution, setting forth that the student therein named has attained a certain rank, grade or degree in the studies he has pursued. If it be said that there is no express power granted to such an institution by the general law of its organization to confer degrees on its students, it may be with much force replied that neither is express power bestowed by that law to prescribe the course of study the students shall pursue ; to

.punish or expel them for misbehavior or immoral con-
duct, and yet no one would doubt the power of such an
institution in this regard, whether provided for in its
charter or not.

In this country "a corporation has authority to do
any act which is expressly or impliedly authorized by its
charter." "Charters of incorporations frequently pre-
scribe only the main objects of the companies formed
under them; authority to use the means necessary to
attain these objects must, therefore, be supplied by im-
plication." "Hence it is but reasonable to suppose that
where the legislature incorporates a company for the
purpose of carrying on a particular business the intention
is that the company shall carry on the business in the
usual manner, and that it shall have authority to exer-
cise all powers necessary for this purpose." "Charters
must be construed in the light of custom; such transac-
tions as are customary or usual in the prosecution of a
business of the kind in which a corporation is engaged,
are impliedly authorized by its charter." Morawetz on
Private Corp., secs. 151, 152, 189 and cases cited. In
*Barry v. Merchants' Exchange Co.*, 1 Sandf. Ch. 289,
Vice-Chancellor Sandford said: "A corporation in order
to attain its legitimate objects may deal precisely as an
individual may who seeks to accomplish the same ends."
A variety of instances illustrative of this rule may be
met with in the authorities where a corporation without
being specially empowered by charter so to do in the
transaction of its legitimate business may buy, sell or
mortgage land, execute notes or bonds, and perform
other business acts germane to the purposes of its crea-
tion, except when restrained by law. *White Water
Valley Canal Co. v. Vallette*, 21 How. 424; *Bostock v.
Railway Co.*, 4 El. and Bl. 819; *Ex parte Birmingham
Banking Co.*, L. R., 6 Ch. 83; *Ketchum v. Buffalo*, 14
New York, 356.

And it will not be inappropriate to remark, what
is well known, that one of the strongest incentives
to diligence, industry and habits of good order on

the part of students in the pursuit of their studies, is found in the prospect and in the fact that at the end of their arduous collegiate journey they will receive from their *alma mater* a lasting testimonial of their toils and their scholastic merits, in the shape of a diploma. These considerations induce the belief that the college of medicine in question, under power necessarily implied from its being incorporated for a certain purpose, could lawfully issue and deliver to its graduates diplomas giving evidence of the matters therein recited. But whether this be true or untrue does not affect the determination of the point in hand; for a corporation when acting within the apparent scope of its charter, when doing acts *prima facie* legitimate on their face, acts which seem to bear the impress of being germane to the purpose for which it was formed and usual in the ordinary exercise of the powers which the charter confers; such acts will be presumed *infra vires* and the burden of maintaining the contrary lies on him who asserts it. In the absence of proof no legal presumption obtains that the law in the given instance has been violated; on the contrary, the same favorable intendments will be indulged respecting these artificial bodies, as would be entertained towards natural persons, and these law-made entities are to be held within the benefit of the rule which imputes innocence rather than wrong to the conduct of men. Morawetz Priv. Corp. 154, and cases cited; Ang. and Ames on Corp., 111 and cases cited; 2 Wait's Act. and Def., 334. Now, matters which the law presumes need not be stated in pleading. R. S., 1879, sec. 3548. The act of issuing and delivering a diploma to the relator being apparently within the corporate capacity, under the terms of the law, of the organization of the college will, therefore, be presumed legal and within legitimate limits, and this presumption being indulged obviates any supposed necessity for a direct statement of the possession of corporate capacity to do the act in question. It results that the first ground of the demurrer must be ruled against the respondents.

III.   The second point made by the demurrants will now be discussed in connection with the statute on which it is bottomed.   What is the purpose of that statute? Its central and dominant idea?   By what instrumentalities and what methods was that purpose to be effectuated and that idea clothed with the garments of practical performance?   An answer to these questions solves the sufficiency of the petition on the point now being considered.   An attentive reading of the statutory provisions already quoted, together with others in *pari materia*, cannot fail to discover that the legislature, so far as legislation could be made effectual, was determined to provide for the sanitary welfare of the people of this state, and to rid this commonwealth of that class of medical pretenders known by the various designations of empirics, mountebanks, charlatans and quacks.   To this end, but three days prior to the approval of the act in question, one had been approved creating a "state board of health," on which was conferred a "general supervision over the health and the sanitary interests of the citizens of the state," and made their duty to recommend to the general assembly sanitary laws, and to cities and county courts the adoption of any rules they may deem wise or expedient for the protection and preservation of the health of the citizens thereof, and they were also empowered to administer oaths and "to take testimony in all matters relating to their duties and powers."   Acts 1883, pp. 95–97, secs. 3 and 16.   To this end, also, it was enacted that when any one desired to practice the medical profession in this state, he should do one of two things : either to present himself before the state board of health and "submit to such examination as the said board shall require," or, if a graduate of medicine, to present his diploma to the state board of health "for verification as to its genuineness," and "if the diploma is found to be genuine and the person named therein to be the person claiming and presenting the same, the state board of health shall issue its certificate to that effect," etc.   Acts 1883, p. 115, sec. 1.

An ingenious argument has been made in behalf of relator endeavoring to show that his right to a certificate is exclusively bottomed on section one, just quoted; that this right became consummate when the diploma was verified as to the genuineness and the person named in it found to be the person claiming and presenting the same, and that this court in ascertaining whether relator is entitled to the exercise of our mandatory authority in his behalf, must centre and confine our attention to that section alone. Should we do this, our action would certainly be at variance with that very familiar rule of ascertaining the legislative intent, which requires that, save in exceptional instances, instances where the legislative object is accomplished, embraced and ended in and by a single section, that the whole statute, and sometimes others in *pari materia*, must be looked to in the effort to discover the entire legislative meaning. Potter's Dwar., pp. 144, 145, secs. 12, 17, 19; Sedgwick on Construction of Stat., 325. This case is not an exceptional one; the legislative thought and purpose are not fully expressed, nor the legislative methods whereby that purpose is to be executed, fully described in section 1. This will become apparent as we proceed further in this discussion. Thus, while section 1 provides for the issuance of certificates to graduates and to examinees, it remains for section 2 to declare that the board shall "prepare two forms of certificates, one for persons in possession of diplomas, the other for candidates examined by the board." As the legislature has only made provision in that section for but *two* forms of certificates, neither of which embraces the case of a graduate who has been so unfortunate as to *lose* his diploma, it must needs follow that the legislature has made no provision for a case of that character. This being true, it will also follow that those words in that section requiring the board "to issue certificates to all who shall furnish satisfactory proof of having received diplomas from legally chartered medical institutions in

good standing," are to be applied, and can only be applied to that class of persons for whom the board is to prepare one of those forms of certificates, and none others, *i. e.*, to that class of "persons in possession of diplomas."

As a necessary sequence of the foregoing it must devolve on him who is possessed of a diploma to furnish to the board "satisfactory proof of having received" such diploma "from a legally chartered medical institution in *good standing*," and this, too, in addition to the requisites as to verification, particularly specified in section 3. And, if leaving the plain language and letter in section 2, we should look to the reasons which gave to the statutory provisions their birth and their being; look to the mischief they were designed to extirpate and the remedy and protection they were designed to furnish, it would seem passing strange that any other conclusion than that announced should be reached. For why should the legislature create a board of health with such comprehensive powers, and then in one case, where profert is simply made of the diploma and the affidavit, require that the board should look no further, but straightway go through the perfunctory performance of issuing a certificate to the applicant, and yet when the diploma is merely lost, proof satisfactory must be made that the absent diploma is issued by "a legally chartered medical institution in good standing?" Is it not obvious, under the claim made by the relator, that the possessor of the diploma, *ipso facto*, becomes the possessor of a certificate; if so, wherein consists the protection which the board of health affords in that class of cases? Does not such a construction for the most part nullify the statute and abolish the board of health? If satisfactory proof that a diploma has emanated from a medical institution in "good standing" is requisite in the one case, why not in the other? Surely no satisfactory answer, no answer based upon the reason and spirit of the law can be returned to these questions, save one which coincides with the views already announced.

The State ex rel. Granville v. Gregory.

For these reasons the second ground of demurrer must be held valid and the petition fatally defective in lacking the allegations which the demurrer points out.

IV.    There is another matter which, though not raised by the demurrer, is obviously presented by the petition when considered in connection with the section just discussed and the nature of the relief sought.    And we examine this matter the more readily because requested by both parties to this controversy, that the "whole law of the case be settled in the outset."    The point we refer to is this:  If the proper view has been taken of the meaning of section two aforesaid, then the board of health, in the discharge of duties in reference to the issuance of certificates, is engaged in the performance of those things which essentially partake of a judicial nature, requiring the examination of evidence and passing on its probative force and effect, requiring the exercise of judgment and the employment of discretion. Now, while courts on suitable occasions will apply the spur of mandamus to put the discretion of inferior courts and officers in motion, yet after that discretion has been exercised, as in the case at bar, no matter in what way, the mandatory authority to compel the doing of the particular act prayed for is at an end.    Of course these remarks  have no relevancy to acts simply ministerial, where no judgment is to be exercised; but this case is not regarded as of that character, and whenever an element, shred  or  degree of discretion enters into the duty to be performed,  the functions of mandatory authority are shorn of their customary potency and  become powerless to dictate terms to that discretion.   Were the rule otherwise, instead of officers discharging their duties in accordance with their own official discretion, that of a court would be substituted therefor, and in instances like the present, should this court, proceeding contrary to all precedent, arrogate to itself such revisory powers, it would, while palpably usurping functions conferred exclusively by the law upon others, in the endeavor to ascertain

whether a given college is a "medical institution in good standing," might find itself seriously embarrassed by the character of the investigation it would be compelled to make; might find itself wandering amid the mazes of therapeutics or else boggling at the mysteries of the pharmacopoeia, etc. To state such an outcome is necessarily to condemn the process of reasoning by which it is reached.

Abundant authority, it need scarcely be said, sustains the position that discretionary powers are not revisable, and that this rule applies with especial force to cases where mandatory aid is sought. High on Extr. Leg. Rem. secs. 24, 43, 44, 44a, 45, 46, 47, 57, 58, 230. and cases cited; Ang. and Ames on Corp., secs. 713, 714 and cases cited; *Howland v. Eldredge*, 43 N. Y. 457; *People v. Brennan*, 39 Barb. 651; *People v. Supervisors*, 12 John. 414; *Chase v. Canal Co.*, 10 Pick. 244; *Hargreaves v. Taylor*, 3 B. and S. 611.

In a recent case in Minnesota, *State v. State Medical Examining Board*, 32 Minn. 324, the same view is taken of the point and mandamus refused, where the board of health of that state, acting under a statute similar to our own, had refused to grant a certificate to one who had been guilty of "unprofessional or dishonorable conduct." And in that case it is also decided, and a number of authorities are cited in support of the ruling, that the creation of such a board with powers such as have been described, is within the power of the legislature and does not transcend constitutional limits. It is thought best to say this in conclusion, that notwithstanding what has been said relative to the discretionary powers of the board of health, that according to the express terms of the proviso in section 2, *supra*, such discretionary power does not extend to discriminating against any particular school or system of medicine, and that, should such discrimination ever occur, the limits of discretionary power will have been passed. Relator, if he desires, has leave to plead further. All concur, except Hough, C. J., who

concurs in all the paragraphs of this opinion, except the last one, which he does not regard as pertinent to the present state of the pleadings.